**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

ALAN TUCEK,

     *Plaintiff*,               CASE NO. 1:17-cv-14233
                                  DISTRICT JUDGE THOMAS L. LUDINGTON
*v.*                           MAGISTRATE JUDGE PATRICIA T. MORRIS

CADILLAC ACCOUNTS
RECEIVABLE MANAGEMENT, INC.,

     *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (ECF 35 & 37)**

## I.    RECOMMENDATION

Plaintiff Alan Tucek alleges that Defendant Cadillac Accounts Receivable Management, Inc., violated the Fair Debt Collection Practices Act's (FDCPA) provisions in 15 U.S.C. § 1692f and § 1692g(b). (ECF 23 at PageID.190-195.) Before the Court are the parties' cross motions for summary judgment. (ECF 35, 37.) For the reasons below, I **RECOMMEND** that Defendant's motion be **DENIED** (ECF 35) and Plaintiff's motion be **GRANTED IN PART** and **DENIED IN PART** (ECF 37).

## II.    REPORT

### A.    Factual Background and Procedural History

Plaintiff's two claims concern a debt that Defendant attempted to collect, allegedly

1

in violation of the FDCPA. (ECF 23.)[1] The debt arose from a doctor's visit in September 2011. (ECF 23 at PageID.184.) Plaintiff says that he paid the full medical bill and thought nothing of the matter until the doctor's office mailed him a letter in March 2017 demanding $100.00 for his earlier visit. (ECF 23 at PageID.185.) According to the complaint, the office indicated it had mistakenly underbilled him by that amount during the visit. (*Id.*) Plaintiff asked for proof but received none; instead, the claim was given to Defendant, a debt collector, for collection. (*Id.*)

Defendant sent its first letter to Plaintiff on May 16, 2017. (ECF 23 at PageID.186.) As explained more below, a debt collector's initial communication must include or be followed within five days by written notice that, among other things, the consumer (*i.e.*, the debtor) can notify the collector by writing within thirty days that he or she is disputing the debt. 15 U.S.C. § 1692g(a)(4). At that time, collection efforts must cease until the debt collector verifies the debt. 15 U.S.C. §§ 1692g(a)(4), 1692g(b). The letter here informed Plaintiff of this right to dispute the debt. (ECF 1 at PageID.11.) The face of the letter—which is all that is in the record, as the back of it was not copied—contains the following address: "1015 Wilcox St, PO Box 358, Cadillac, MI 49601." (ECF 1 at PageID.11.) Elsewhere in the letter, Defendant stated that checks could be sent to "C.A.R.M. [*i.e.*, Defendant], PO Box 358, Cadillac, MI, 49601-0358." (ECF 1 at PageID.11.)

A week after receiving the letter, Plaintiff disputed the debt in a letter sent to the address Defendant provided for sending checks, the P.O. box. (ECF 23 at PageID.186.) It

---

[1] The operative complaint is Plaintiff's First Amended Complaint, which the Court granted him leave to file. (ECF 21 at PageID.135.)

was a certified letter, so Plaintiff was informed that a notice of its arrival was slipped into the P.O. box on May 25, 2017. (ECF 23 at PageID.187.) There it sat for days waiting for Defendant to pick up the notice and claim the letter. (ECF 23 at PageID.187.) But no one did and, roughly a month later, the unclaimed letter made its way back to Plaintiff. (ECF 23 at PageID.187.)

This result was by design, according to a declaration made by Defendant's president Jon Dracht.[2] (ECF 35 at PageID.218.) Defendant maintains a "longstanding and uniform practice" of ignoring certified-mail notices in its P.O. box, which Dracht assures is standard industry practice. (ECF 35 at PageID.218.) Apparently, "[t]he primary purpose of this policy is to better track and manage the response time to any attempted service of process for litigation." (ECF 35 at PageID.218.) For that reason, "the policy applies to all certified mail, not merely communications that might come from consumers." (ECF 35 at PageID.218.)

According to Dracht's declaration, from June 19 until August 7, Defendant left four voicemails for Plaintiff and finally got through in a fifth call but was immediately hung up on by Plaintiff. (ECF 35 at PageID.187-188.) The day after the last phone call, Defendant fired off a letter to Plaintiff advising that he had "failed to send in your payment after repeated attempts by our office," and warning that the debt might go on his credit report. (ECF 1 at PageID.16.) Plaintiff responded with another letter addressed to the same P.O. box but this time apparently not sent by certified mail. (ECF 35 at PageID.221.) He again

---

[2] The parties dispute the admissibility of the declaration, an issue I take up below.

3

informed them that he disputed the debt. (ECF 35 at PageID.221.) After this, Dracht states that Defendant ceased its collection attempts, "treating the account as if it had been disputed within the initial 30 day validation period." (ECF 35 at PageID.218.)

Plaintiff brought the present lawsuit in December 2017. (ECF 1.) The current amended complaint contains two claims under the FDCPA: (1) Defendant's policy of refusing certified mail and its refusal to take Plaintiff's certified letter in particular are unfair and unconscionable collection practices prohibited by 15 U.S.C. § 1692f, (ECF 23 at PageID.191-192); and (2) Defendant violated 15 U.S.C. § 1692g(b) by continuing collection efforts after Plaintiff sent his May 2017 letter disputing the debt, (ECF at PageID.193-195). Defendant's subsequent motion for judgment on the pleadings was denied in July 2018. (ECF 21.) The Court found that the § 1692f claim was viable, as the challenged practice of ignoring certified mail arguably qualified as unfair or unconscionable. (ECF 19 at PageID.119.) Regarding the § 1692g(2) claim, the Court held that proof of mailing and receipt—here, in the form of delivery notice—sufficed to meet the notification requirements in § 1692g(b). (ECF 21 at PageID.134.)

The parties have now filed cross motions. (ECF 35, 37.) Defendant asks for full summary judgment because, it argues, Plaintiff lacks standing to bring either claim; alternatively, Defendant seeks summary judgment on the § 1692f claim, contending that its policy of not collecting certified mail cannot rise to the level of an unfair or unconscionable practice. (ECF 35.) Plaintiff moves for summary judgment on both claims because, he asserts, Defendant's certified-mail policy lacks any conceivable justification and therefore violates § 1692f; and regarding § 1692g(b), there is no issue of material fact

that Defendant continued collection efforts after receiving Plaintiff's May 2017 disputing the debt. (ECF 37.) Briefing is complete and the motions are ready for resolution.

## B.    Standard of Review

A motion under Fed. R. Civ. P. 12(b)(1) allows a party to raise the lack of subject-matter jurisdiction as a defense. As the Sixth Circuit has explained, a Rule 12(b)(1) motion "can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). In a factual attack, which is what Defendant launches here, (ECF 35 at PageID.207), "a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Cartwright*, 751 F.3d at 759-760. The burden of establishing jurisdiction remains with the plaintiff. *Id.* at 760.

Summary judgment under Rule 56(a) is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The parties' arguments about whether a fact can be genuinely disputed must cite supporting materials in the record. Fed. R. Civ. P. 56(c)(1). The materials must be transformable into a form that the court can admit into evidence. Fed. R. Civ. P. 56(c)(2). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the

plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493.

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. Fed. R. Civ. P. 56(c)(3); *Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so onesided that one

party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

### C.      Standing

#### 1.      General Law of Article III Standing

The threshold issue is whether Plaintiff has standing to bring his FDCPA claims. If not, then the Court lacks jurisdiction to hear the case. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997). This is because the concept of standing derives from the Constitution's extension of judicial power to the courts to hear only "Cases" and "Controversies." U.S. Const. art. III, § 2. The standing doctrine serves to "enforce[] the Constitution's case-or-controversy requirement." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citation omitted). "A claimant bears the burden of establishing standing and must show it 'for each claim he seeks to press.'" *Hagy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018) (*quoting DaimlerChrysler Corp.*, 547 U.S. at 352).

The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* (citations omitted). Second, the injury must be causally connected to the defendant's conduct, *i.e.*, it must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."

7

*Id.* (citations omitted). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (citation omitted).

The case here centers on the first requirement. At base, this prong requires that the plaintiff have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." *Baker v. Carr*, 369 U.S. 186, 204 (1962). This precept is what requires the plaintiff to show an "injury in fact, economic or otherwise," as the Court first articulated in *Assoc. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970). *See* William A. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 231 (1988) (noting *Baker* and recognizing that *Data Processing* was the first case to state that 'injury in fact' was required, and to formulate the issue of plaintiff's standing as a factual (and therefore an ostensibly non-normative) matter"). Factual injury sufficient for standing requires, as noted, particularization and concreteness. *Lujan*, 504 U.S. at 560. The former means that the harm "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016) (citation omitted). In other words, the harm cannot come in the form "of a generalized grievance" with an impact that is "undifferentiated [as to the plaintiff] and 'common to all members of the public.'" *United States v. Richardson*, 418 U.S. 166, 176-177 (1974) (citation omitted).

To be "concrete," an "injury must be '*de facto*'; that is, it must actually exist." *Spokeo*, 136 S.Ct. at 1548. This serves to distinguish real injuries, which are justiciable, from abstract harms, which are not. *Id.* Still, intangible harms can be concrete for purposes of standing. *Id.* "In determining whether an intangible harm constitutes injury in fact, both

history and the judgment of Congress play important roles." *Id.* at 1549. Because the case-or-controversy requirement "is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* The Court has often stressed the role of history in this inquiry. *See Vermont Agency of Nat'l Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000) ("Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" (*quoting Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 102 (1998)); *Coleman v. Miller*, 307 U.S. 433, 460 (1939) (opinion of Frankfurter, J.) ("Judicial power could come into play only in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies.' It was not for courts to meddle with matters that require no subtlety to be identified as political issues.").

In addition, as *Spokeo* noted, Congress's crafting of statutes should inform the standing analysis "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements." 136 S.Ct. at 1549. More broadly, the Supreme Court has noted that "'the . . . injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing"'" *Lujan*, 504 U.S. at 578 (*quoting Warth v. Seldin*, 422 U.S. 490, 500 (1975)); *see also id.* at 580 (Kennedy, J., concurring) ("In my view, Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before, and I do

not read the Court's opinion to suggest a contrary view. . . . In exercising this power, however, Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit.").

A sufficient injury based on a statute might exist irrespective of economic damages or actual damages—for example, when a statute provides individuals a right to truthful information about housing availability, *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982), or when the violation of anti-discrimination laws deprives existing tenants of the right to "interracial associations" that come from having a diverse set of neighbors, *see Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209-210 (1972).[3] But "a bare procedural violation, divorced from any concrete harm," is not enough for Article III standing. *Spokeo, Inc*, 136 S.Ct. at 1549.

---

[3] *See also* William Baude, *Standing in the Shadow of Congress*, 2016 Sup. Ct. Rev. 197, 199-203 (2016) (describing Supreme Court caselaw holding that statutes can create the basis for justiciable injuries even when no actual damages result). These holdings are consistent with the background principle or practice that often allows awards of nominal damages "for violations of rights that did not result in harm." F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275, 285, 288-289, 314-317 (2008); *see also Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[W]e believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury."); Dan B. Dobbs, *Law of Remedies: Damages, Equity, Restitution* § 3.3(2) (3d ed.) (describing the many private causes of action permitting nominal damages); Baude, *supra* at 217 ("'[I]t long been settled that a claimant may waive or forgo claims for compensatory and punitive damages and pursue nominal damages alone.' In more modern cases, the Court has specifically affirmed that nominal damages are available to compensate for the violation of legal rights." (citation omitted)); *see also Moore v. Liszewski*, 838 F.3d 877, 879 (7th Cir. 2016) ("The alternative, which would make the life of the law a little more livable, would be a rule that a party that establishes a violation of his legal right is entitled to an award of court costs and/or attorneys' fees, period—that is, without regard to whether he has obtained *any* damages.").

Because "*Spokeo* seems to require something more than just the violation of a legal right," despite the Court's references to intangible injuries, it has been questioned how the case squares "with the basic idea of nominal damages, whose very point is that nothing more concrete need be shown." Baude, 2016 Sup. Ct. Rev. at 217. That question can be avoided here, as I find actual injuries that give rise to standing.

Because the concreteness requirements arises from the Constitution, it fixes bounds that Congress cannot transgress. *Id.* at 1547. "Congress may, by legislation, expand standing to the full extent permitted by Art. III," but "[i]n no event . . . may Congress abrogate the Art. III minima." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979). As such, the primary function of Article III standing is to ensure the proper separation of powers: "the law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Raines*, 521 U.S. at 820. In this way, standing "prevent[s] the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *see also Vermont Agency of Nat'l Res.*, 529 U.S. at 771; *Lujan*, 504 U.S. at 576-577; John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219, 1223-1224 (1993); Hon. Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk Univ. L. Rev. 881, 894-897 (1983).

Determining whether a statute can create standing—that is, whether its violation injures a concrete interest—is no easy feat. *See* Baude, 2016 Sup. Ct. Rev. at 209-216, 223-227. As Justice Thomas's concurrence in *Spokeo* pointed out, the better view might be that, because common-law courts traditionally served as a forum to enforce private rather than public rights, and because Congress can create private rights, "[a] plaintiff seeking to vindicate a statutorily created private right need not allege actual harm beyond the invasion of that right." 136 S.Ct. at 1553 (Thomas, J., concurring); *see also Frank v. Gaos*, 139 S.Ct. 1041, 1047 (2019) (Thomas, J., dissenting) ("[A] plaintiff seeking to vindicate a private right need only allege an invasion of that right to establish standing."). The injury-in-fact

11

requirement, then, applies to violation of *public* statutory rights—those that claim harm to the aggregated community. *Spokeo*, 136 S.Ct. at 1552-1553 (Thomas, J., concurring).

This approach also makes sense of standing's basis in separation-of-powers principles: "where one private party has alleged that another private party violated his private rights, there is generally no danger that the private party's suit is an impermissible attempt to police the activity of the political branches or, more broadly, that the legislative branch has impermissibly delegated law enforcement authority from the executive to a private individual." *Id.* at 1553; *see also* F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275, 275 (2008) ("[R]equiring a showing of factual injury in private rights cases is ahistorical and actually undermines the separation of powers by preventing the courts from guarding rights and by limiting Congress's power to create rights.").

A concurrence—much less a dissent—is not binding and Justice Thomas's is no exception. The Sixth Circuit has recognized that Justice Thomas's theory "deserves further consideration," but that the majority opinion and Sixth Circuit precedent under it are controlling. *Huff v. TeleCheck*, 923 F.3d 458, 469 (6th Cir. 2019). Still, the Supreme Court has, in majority opinions, stressed that because of the separation-of-powers concerns that ground the standing doctrine, "[o]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper*, 568 U.S. at 408. This indicates that something less rigorous applies when the action at issue is a private party's violation of a private statutory right. And *Spokeo* did not disavow the long

12

line of cases upholding Congress's role in creating private rights, the violation of which constitute concrete injuries. Thus, the fact that a statute seeks to protect *private* interests is not altogether irrelevant to the analysis.

### 2.    Parties' Arguments

Defendant's argument does not distinguish between the FDCPA statutory sections at issue but broadly contends that Plaintiff "has asserted nothing other than a bare procedural violation" without any evidence of actual injury. (ECF 35 at PageID.210.)[4] None of the violations caused Defendant to report the debt credit rating agencies, the argument continues. (*Id.*) Plaintiff was never impeded from paying the debt, disputing it, or responding in any other manner, and Defendant notes that Plaintiff waited for months to send another letter despite knowing that the first one was not received. (*Id.*)

By contrast, Defendant depicts its own actions as prompt and reasonable: as soon as it received the second letter it ceased collection attempts. (*Id.*) In Defendant's opinion, Plaintiff's having been forced to send a second letter hardly constitutes a concrete injury. (*Id.* (citing *Lyshe v. Levy*, 854 F.3d 855, 859 (6th Cir. 2017).) And to be sure, Defendant admits, it contacted him a few times before it got his second letter, but five phone calls and

---

[4] *Spokeo* emphasized that the particularity and concreteness requirements are independent. 136 S.Ct. at 1548. Defendant's argument appears to focus on the "concrete" requirement. (ECF 35 at PageID.208-211.) In the very last sentence of its argument, however, Defendant states that Plaintiff "suffered no concrete *or* particular injury," but it nowhere develops this contention regarding particularity. (ECF 35 at PageID.211 (emphasis added).) This stray reference is not sufficient to present an argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citation omitted)). In any event, Plaintiff alleges injuries to himself, not to the public in general or some undifferentiated group. Thus, his claim satisfies the particularity prong of the standing doctrine.

four voicemail—none of which Plaintiff says was threatening or harassing—over roughly two months cannot "plausibly support any sort of stress or mental anguish damages." (ECF 35 at PageID.211.) Finally, "Plaintiff has offered no proof of any out-of-pocket costs as a result of [Defendant's] collection efforts," Defendant notes. (*Id.*)

Plaintiff responds by examining both statutory sections at issue. (ECF 41 at PageID.313-319.) Regarding § 1692g(b), Plaintiff relies on the Sixth Circuit's decision in *Macy v. GC Servs. Ltd. Partnership*, 897 F.3d 747 (6th Cir. 2018), which held that a consumer had standing to challenge a debt collector's failure to disclose that the consumer needed to dispute the debt in writing to obtain certain FDCPA. (ECF 41 at PageID.313.) Plaintiff reasons that "[i]f failing to notify a consumer about *how* to dispute the debt constitutes a concrete harm, then certainly a consumer has suffered an injury-in-fact when he *actually* disputes the debt and the collector ignores the dispute entirely and continues collection efforts." (ECF 41 at PageID.315.) Defendant replies that "unlike the defendant in *Macy*, [it] did not misstate the consumer's legal rights in its validation notice." (ECF 42 at PageID.331.) And *Macy* addressed a facial standing challenge, whereas Defendant raises a factual attack—a key difference, Defendant concludes, because "the uncontroverted evidence" shows that Defendant "retroactively honored Plaintiff's initial attempt," Plaintiff never lost his right to dispute the debt, and he never risked losing that right. (ECF 42 at PageID.331-332.)

Continuing with his argument, Plaintiff contends that Defendant's decision not to report the matter to a credit rating agency is irrelevant because Defendant continued collection activities. (ECF 41 at PageID.315.) And the fact that Defendant may have made

14

only a handful of calls is also beside the point because courts have found "[t]hese types of unwanted communications" to lead to intangible harm. (ECF 41 at PageID.316.) Plaintiff offers a similar argument regarding § 1692f, which he says represents a substantive rather than procedural right. (*Id.*) The unfair practice here—refusing to accept his certified letter—led to Defendant violating his rights under § 1692g(b). (ECF 41 at PageID.316-317.)

### 3. Application

To begin, I disagree with Defendant's blanket characterization of the relevant FDCPA rights as mere procedures under the facts of this case. Neither the Supreme Court nor the Sixth Circuit have defined the concepts of substantive and procedural rights for purposes of standing doctrine. The legal meaning of these terms, however, is clear. A procedural law consists of "[t]he rules that prescribe the steps for having a right or duty judicially enforced, as opposed to the law that defines the specific rights or duties themselves." *Black's Law Dictionary* (10th ed.). The substantive law, by contrast, is "[t]he part of law that creates, defines, and regulates the rights, duties, and powers of the parties." *Id.* Courts have adopted nearly identical definitions. *See Bock v. Pressler & Pressler, LLP*, 254 F. Supp. 3d 724, 732 (D.N.J. 2017) (*quoting Landrum v. Blackbird Enterprises, LLC*, 214 F. Supp. 3d 566, 571 (S.D. Tex. 2016)).

The FDCPA manifests a design to protect private rights in a substantive manner. *Cf. Spokeo*, 136 S.Ct. at 1549. Congress memorialized its findings and purposes in the statutory text. 15 U.S.C. § 1692. It found "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). These

abuses led to real harms, including bankruptcy, marital discord, job loss, and privacy invasions. *Id.* The stated purpose of the statute was "to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).

"To advance these goals, the FDCPA codified several specific consumer-protective rights, including those in Section 1692g." *Macy*, 897 F.3d at 756; *see also Jackson v. Abendroth & Russell, P.C.*, 207 F. Supp. 3d 945, 952 (S.D. Iowa 2016) ("The statute accomplishes this purpose [*i.e.*, the purpose described in § 1692(e)] by providing consumers the right to seek verification of an alleged debt within thirty days after receiving notice of the debt from a debt collector."). And it gave consumers a private right of action to enforce those rights, as well as the right statutory damages, 15 U.S.C. § 1692k(a). Thus, Congress was not targeting public wrongs that harmed the community as a whole; rather, it identified discrete injuries between private parties and gave injured consumers a mechanism to obtain relief.

This does not mean, of course, that every provision in the FDCPA protects a substantive right. But the alleged violations of § 1692g(b) and § 1692f at issue here do implicate the statute's substantive protections. Section 1692g deals with the validation of debts. It provides that, within five days of first communicating with a consumer regarding "collection of any debt," the collector must send written notice containing, among other things, "a statement that unless the consumer, within thirty days after receipt of the notice,

16

disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector," and "a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector." 15 U.S.C. §§ 1692g(a)(3)-(4). The key provision comes next, in § 1692g(b):

> If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

Thus, a written dispute ends collection efforts until the collector verifies the debt. This "enable[s] debtors to cheaply and quickly resolve disputes with debt collectors." *Vangorden v. Second Round, Ltd. P'ship*, 897 F.3d 433, 440 (2d Cir. 2018) (*quoting McLaughlin v. Phelan Hallinan & Schmieg, LLP*, 756 F.3d 240, 248 (3d Cir. 2014)). And it seeks to "eliminate the recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." *Haddad v. Alexander,*

*Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 785 (6th Cir. 2014) (*quoting* S. Rep. No. 95-382, at \*4 (1977)); *see also Bartlett v. Heibl*, 128 F.3d 497, 499 (7th Cir.1997) ("These provisions are intended for the case in which the debt collector, being a hireling of the creditor rather than the creditor itself, may lack first-hand knowledge of the debt."). More than that, § 1692g(b) shields consumers from the collection efforts that Congress considered injurious. In this way, it defines the rights and duties of the parties and consequently is a substantive provision.[5]

Section 1692f likewise protects substantive rights. It states that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." The statute does not define "unfair" or "unconscionable," *see Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 534 (6th Cir. 2014), but it does list examples of collection practices fitting those terms, including attempts to collect more than agreed upon or permitted by law, the solicitation of postdated payments in order to threaten or institute criminal prosecution, "[c]ommunicating with a consumer regarding a debt by post card," and using language or symbols other than the debt collector's address (or business name if the name does not indicate debt collection) on envelopes when communicating with a consumer by mail or telegram. 15 U.S.C. §§ 1692f(1), (3), (7), (8). These provisions, like those in § 1692g(b), give the parties rights and responsibilities in the manner of a substantive law.

---

[5] The court in *Jackson v. Abendroth & Russell, P.C.*, addressed violations of § 1692g(a) but for some reason lumped in § 1692g(b) when concluding that these provisions are merely procedural rights that lower the risk of "dunning the wrong person or attempting to collect debts which the consumer has already paid." 207 F. Supp. 3d at 960 (*quoting* S. Rep. No. 95-382, at \*4). But with regard to violations of § 1692g(b), the provision does not seek simply to decrease the risk of that harm—it punishes that conduct directly, thereby erecting rights and remedies to address this injury.

*See Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 691 (8th Cir. 2017) ("With §
1692f(1), Congress identified a harm—being subjected to attempts to collect debts not
owed.").

That § 1692g(b) and § 1692f protect substantive rights is important, but not
determinative. *Spokeo* indicates that "Congress' role in identifying and elevating intangible
harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement
whenever a statute grants a person a statutory right and purports to authorize that person to
sue to vindicate that right." 136 S.Ct. at 1549. This suggests that statutory protection of
even private substantive rights might not always suffice for standing. Tellingly, however,
the Court did not give any examples of when such rights would fail; instead, it observed
that because of this limitation on Congress's power, a violation of a purely *procedural*
provision, with no other harmful effect, would not satisfy Article III's requirements. *Id.*

Still, the Court did not sketch or purport to create any meaningful rules based on the
distinction between substantive and procedural rules. *See Meyers v. Nicolet Restaurant of
De Pere, LLC*, 843 F.3d 724, 727 n.2 (7th Cir. 2016) ("But whether the right is
characterized as 'substantive' or 'procedural,' its violation must be accompanied by an
injury-in-fact."); *Everett v. Memphis Light Gas & Water Div.*, 2017 WL 1830165, at *3
(W.D. Tenn. April 18, 2017) ("This Court is not convinced that the *Spokeo* majority . . .
recognizes this distinction" between substantive and procedural rights in a manner similar
to Justice Thomas's concurrence.); *but see Estate of Caruso v. Fin. Recoveries*, 2017 WL
2704088, at *4 (D.N.J. June 22, 2017) ("Thus, standing based [only] on a violation of a
statutorily created right turns on whether such a right is substantive or merely procedural."

(citation omitted)). Rather, the Court used the concept of bare procedural rules to illustrate the lack of concrete injury. And one can imagine a seemingly substantive violation that might have no deleterious effects and thus result in no concrete injury. *Cf. Meyers*, 843 F.3d at 727 n.2 ("A violation of a statute that causes no harm does not trigger a federal case."). As such, the analysis must turn upon the concreteness of the injury—its character as a real harm, not a conjectural or abstract issue. The substantive nature of the protections in § 1692g(b) and § 1692f are only a factor, albeit an "instructive and important" one. *Spokeo*, 136 S.Ct. at 1549.[6]

In this regard, courts have endorsed Congress's evident attempt in § 1692g(b) and § 1692f to create rights that can lead to standing. Start with the Sixth Circuit's decision in

---

[6] As discussed, *Spokeo* suggested that courts consider whether an intangible injury "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." 136 S.Ct. at 1549. The Court did not indicate, however, that an injury must have historical pedigree. *See Jeffries v. Volume Servs. America, Inc.*, 928 F.3d 1059, 1070 (D.C. Cir. 2019) (Rogers, J., concurring in part) ("Thus, while the Court indicated that 'historical practice' can be evidence of what constitutes a concrete injury-in-fact, it did not suggest that every plaintiff who alleges her statutory rights have been violated *must* analogize her injury to a harm recognized at common law."). Nor did it explain how close the relationship must be or what period the common-law analogue must come from. Since the injury requirement arises from the Constitution, the founding era seems the relevant point of comparison. *See South Carolina v. United States*, 199 U.S. 437, 448 (1905) ("The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now.").

When the Constitution was drafted, of course, debtors had less recourse against abusive creditors than at present. They could, for example, be tossed in jail. *See* John D. Bessler, *The Birth of American Law: An Italian Philosopher and the American Revolution* 401-403 (2014). But the tide was turning on that practice. *Id.* In fact, the second Congress enacted protections for indigent debtors who found themselves imprisoned for debt. Such individuals could take an oath, whereupon the creditor was responsible for a "reasonable allowance for the debtor's support," which if it went unpaid the debtor was to be freed. Act for the relief of persons imprisoned for Debt, Sess. I. Ch. 29, § 2 (1792). Further, "the common law system traditionally provided redress for harms closely related to fraudulent or mistaken demands for payment," which is at least part of what § 1692g(b) seeks to prevent. *Jackson*, 207 F. Supp. 3d at 960 (*citing* Restatement (Second) of Torts § 525). Yet § 1692g(b)'s prohibition applies regardless of whether the harm was fraudulent or mistaken, and thus the common law action has a narrower scope. Whether the relationship is "close" enough is unclear. In any event, the parties have not broached this topic and the analysis above suffices to demonstrate that Plaintiff has standing.

*Macy v. GC Services Limited Partnership*. There, the defendants allegedly sent plaintiff "letters that contained legally deficient warnings and advisories, in violation of Section 1692g of the FDCPA." 897 F.3d at 751. Specifically, the letters failed to disclose that the plaintiff needed to dispute the debt in writing in order to obtain § 1692g(b)'s statutory protections. *Id.*; *see* 15 U.S.C. § 1692g(a)(4). The court explained how the statutory notice requirements "further[] th[e] purpose [of protecting debtors from abusive debt collection practice] by requiring a debt collector who solicits payment from a consumer to provide that consumer with a detailed validation notice, which allows a consumer to confirm that he owes the debt sought by the collector before paying it." *Macy*, 897 F.3d at 758 (alterations in original) (*quoting Papetti v. Does 1-25*, 691 F. App'x 24, 26 (2d Cir. 2017)). Consequently, the court determined that the deficient "letters present a risk of harm to the FDCPA's goal of ensuring that consumers are free from deceptive debt-collection practices because the letters provide misleading information about the manner in which the consumer can exercise the consumer's statutory right to obtain verification of the debt or information regarding the original creditor." *Id.* Put differently, the mere risk of stripping the plaintiffs' § 1692g(b) protections was enough to provide standing.

Other courts have held likewise. *See, e.g.*, *Cohen v. Rosicki, Rosicki & Assoc., P.C.*, 89 F.3d 75, 81 (2d Cir. 2018) (holding that "§§ 1692e [prohibiting misleading representations] and 1692g protect an individual's concrete interests, so that an alleged violation of these provisions satisfies the injury-in-fact requirement of Article III"). One such decision expanded on the reasoning above, noting that "§ 1692g goes even further than other information-access laws that the Supreme Court has deemed sufficient to confer

21

standing." *Lane v. Bayview Loan Servicing, LLC*, 2016 WL 3671467, at *4 (N.D. Ill. July 11, 2016). This is because, under § 1692g(b), "when a debtor invokes the right to verify the debt and the debtor disputes the debt, the debt collector must *stop* collection efforts until the verification is mailed to the debtor." *Id.* Consequently, "under the FDCPA, the right to information is not merely an end unto itself, but it actually permits the debtor to trigger (by disputing the debt in writing) a moratorium on collection efforts until the verification information is mailed to the debtor." *Id.* The court noted, "This further demonstrates the concreteness of the injury arising from a § 1692g violation." *Id.*

The same logic applies here. Plaintiff faced more than a mere risk that § 1692g(b) would be violated—it actually was, according to Plaintiff, when Defendant ignored the certified dispute letter and continued collection activities. (ECF 41 at PageID.315.)[7] *Macy* and the related cases above support the conclusion that the statutory violation here caused concrete injury. And the § 1692f allegations are directly related to this injury: Defendant's policy of rejecting certified mail caused it to miss Plaintiff's written dispute, thus leading to the continued collection efforts prohibited by § 1692g(b).

While *Macy* is not directly on point, Defendant's attempts to diminish its persuasive value are unavailing. Defendant claims that Plaintiff did not end up losing his validation rights because his second letter was treated as timely. (ECF 42 at PageID.330.) And,

---

[7] Had Plaintiff never disputed the debt nor had any intention to, then perhaps a procedural violation of the disclosure provisions in § 1692g(a) would have fallen short of creating a concrete injury. *See Jackson*, 207 F. Supp. 3d at 953-954, 961. That is not what happened, however.

Defendant adds, Plaintiff did not face a substantially increased risk of losing his validation rights because, again, the second letter was considered timely. (*Id.*)

This argument misses the point. The real harm Plaintiff alleges was not simply—or even at all—about preserving his chance to verify the debt. Plaintiff is alleging that Defendant flouted § 1692g(b)'s mandate that it stop collection activities. Section 1692g(b) relates to the validation process but endows consumers with protections beyond having their debts verified—if they timely dispute the debt in writing, they are entitled not only to verification, but also a pause in collection. Here, the latter right is at issue.

Defendant's next contention about *Macy* suffers from the same misdirected focus on § 1692g(a)'s validation procedures instead of § 1692g(b)'s substantive requirements. Defendant claims that unlike the collector's misleading letter in *Macy*, its validation notice here was proper. (ECF 42 at PageID.331.) But no one says it was not. Again, the problem was that once Plaintiff received the notice and timely mailed a written dispute, § 1692g(b) came into play forcing Defendant to stop collection. Plaintiff says Defendant ignored the letter and continued collection.

Defendant's last sally against *Macy* is that the standing challenge there was a facial attack, cabining the court's consideration to the complaint alone. (ECF 42 at PageID.331-332.) The defendant in *Macy* thus was unable to offer evidence that it treated consumers' verbal disputes just as it did their written ones. *Macy*, 897 F.3d at 758-759. Here, Defendant notes, the attack on standing is factual and the Court can "consider the uncontroverted evidence that [Defendant] retroactively honored Plaintiff's initial attempt to dispute the debt as soon as [Defendant] became aware of it." (ECF 42 at PageID.332.) The key word

here is "retroactively," because before Defendant granted Plaintiff this boon, the collection efforts had continued in violation of § 1692g(b). Defendant's subsequent charity did nothing to retroactively erase the separate statutory violation.

Thus, Defendant's all's-well-that-ends-well theory of standing misses the mark here: all did not end well as far as § 1692g(b) is concerned. As multiple courts have pointed out, communications to consumers in violation of that provision, or similar ones in the FDCPA, constitute a concrete injury. In *Swike v. Med-1 Solutions, LLC*, for instance, the plaintiff received multiple communications from the debtor after having refused to pay the debt. 2017 WL 4099307, at *4 (S.D. Ind. Sept. 15, 2017). This allegedly violated § 1692c(c), which prohibits communications after a consumer refuses to pay. *Id.* Citing numerous supporting decisions,[8] the court found standing "because the receiving of a prohibited debt communication constitutes a real injury in an of itself . . . in addition to the wasted time and annoyance of dealing with debt communications which the Court may reasonably infer followed." *Id.*; *see also Mitchell v. LVNV Founding, LLC*, 2017 WL 4303804, at *10-11 (N.D. Ind. Sept. 28, 2017) (adopting *Swike*'s analysis), *vacated in part on other grounds by* 2017 WL 6406594 (N.D. Ind. Dec. 15, 2017).

Another court reached the same conclusion regarding violations of § 1692c(c) in *Wise v. Credit Control Services, Inc.*, 2018 WL 5112983, at *3 (N.D. Ill. Oct. 19, 2018). It

---

[8] These include the following: *Caprel v. Specialized Loan Servicing, Inc.*, 2017 WL 1739919, at *1, 3 (N.D. Ill. May 5, 2017) (finding standing for violation of "§ 1692c's prohibition against direct communication to a consumer represented by an attorney" because "debt-collection letters sent directly to a represented debtor . . . can cause that debtor confusion, and require him to spend time and effort deciphering the letter, deciding how to respond, and contacting his attorney"); *Reed v. IC Sys., Inc.*, 2017 WL 89047, at *3-4 (W.D. Penn. Jan. 10, 2017) (noting that receiving prohibited phone calls from a debt collector constitutes a sufficient injury, regardless of whether the consumer answered the calls).

noted that *Spokeo* had done nothing to dislodge the principle that receiving "unlawful debt collection demands" gives a consumer standing. *Id.* (citation omitted). Compiling many decisions from the same circuit, the court in *Aguirre v. Absolute Resolutions* found that similar claims against prohibited collection efforts had uniformly been deemed sufficient to provide standing. 2017 WL 4280957, at *4 & n.3 (N.D. Ill. Sept. 27, 2017) (collecting cases); *see also Long v. Fenton & McGarvey Law Firm P.S.C.*, 223 F. Supp. 3d 773, 777 (S.D. Ind. 2016) ("[V]iolations of the FDCPA . . . have been repeatedly found to establish concrete injuries."). Opinions from elsewhere have reflected this reasoning. *See, e.g.*, *Bernal v. NRA Gp., LLC*, 318 F.R.D. 64, 72 (N.D. Ill. 2016) ("Here, NRA's collection letter allegedly violated Bernal's right to be free from such misleading communication," where the plaintiff alleged claims under § 1692e and § 1692f.); *Prindle v. Carrington Mortgage Servs., LLC*, 2016 WL 4369424, at *9 (M.D. Fla. Aug. 16, 2016) ("[T]hrough the FDCPA, Congress has conferred upon all consumers the right to be free from certain practices Congress has deemed abusive. As the object of allegedly false, deceptive, and/or misleading representation in connection with the collection of a debt," the consumer had standing.).

Cases declining to find concrete injury under the FDCPA usually turn on specific circumstances not present here. For example, in *Lyshe v. Levy*, the plaintiff complained that defendants "violated the FDCPA by failing to provide electronic discovery without prompting and requiring that the responses to the requests for admission be sworn and notarized." 854 F.3d at 857. No specific provision of the FDCPA was discussed. Instead, the Court's operative analysis was that "the sort of harm alleged by Lyshe, namely, that he

25

would have been required to visit a notary and contact Appellees to obtain electronic copies of the discovery, was not the type of harm the FDCPA was designed to prevent." *Id.* at 859. On this basis, the court distinguished cases that found standing where the alleged harm was one the FDCPA sought to prevent. *Id.* at 861. In the present matter, the harms alleged—improper collection efforts and the practice (declining certified mail) that led to them—are at the core of what the FDCPA protects. *See* 15 U.S.C. §§ 1692(a), (e).

The Sixth Circuit's rejection of standing in *Hagy v. Demers & Adams* does little for Plaintiff here. Plaintiffs' gripe in *Hagy* was that a letter informing them that the defendant was not attempting to collect a debt violated the FDCPA's requirement the communication somewhere flag that it came from a debt collector. 882 F.3d at 620-621. The only way to find injury from a letter giving a consumer everything he or she wants is if the court "endorse[d] an anything-hurts-so-long-as-Congress-says-it-hurts theory of Article III injury." *Id.* at 622. But in the instant case, the communications to Plaintiff did not grant any of his wishes—instead they confirmed his fears that the collection process continued to lumber forward.

Defendant's final argument is that its debt collection efforts—one letter and five calls over the course of 69 days—could not "plausibly support any sort of stress or mental anguish damages." (ECF 35 at PageID.211.) And Plaintiff offers no proof he incurred any monetary costs, Defendants notes. (*Id.*) This argument fails to convince. Proving the injuries were minor does not prove they lack concreteness. And, in any case, such an argument goes to the merits, not the standing inquiry. *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019) ("There is a difference between failing to establish the

26

elements of a cause of action and failing to show an Article III injury. One is a failure of proof. The other is a failure of jurisdiction."); *see also Casillas v. Madison Ave. Assoc., Inc.*, 926 F.3d 329, 340 (7th Cir. 2019) (Wood, J., dissenting from denial of en banc consideration) ("In demanding proof of injury, we need to guard against pushing a merits judgment into the Article III injury-in-fact inquiry."). Further, Defendant offers no support for the implication that the alleged FDCPA violations must have emptied Plaintiff's pockets or tortured his spirit; to the contrary, "there is no requirement in the FDCPA, or in Article III jurisprudence, that a plaintiff must in every case allege some form of direct pecuniary loss in order to establish a sufficiently concrete injury to support standing." *Martin v. Trott Law, P.C.*, 265 F. Supp. 3d 731, 748 (E.D. Mich. 2017). Thus courts have found standing to bring FDCPA claims despite the plaintiff's failure to allege actual damages. *Id.*; *Sayles v. Advanced Recovery Sys., Inc.*, 206 F. Supp. 3d 1210, 1211, 1213 (S.D. Miss. 2016). Accordingly, Defendant's argument is unavailing.

In sum, Plaintiff has alleged a concrete injury based on violations of the FDCPA. The two statutory provisions he cites create private rights that when violated in the manner alleged here give rise to standing. In particular, they shield him and other consumers from any debt collection attempts for a period after timely dispute letters are sent, 15 U.S.C. § 1692g(b), and from unfair debt collection practices at any time, 15 U.S.C. § 1692f. Here, the alleged violations of these statutes led to injury-in-fact: Defendant's policy of refusing certified mail caused it to target Plaintiff for collection during the § 1692g(b) moratorium. Therefore, injury-in-fact has been shown. To complete the test for standing, I note that the injury is "fairly traceable" to Defendant's conduct and Plaintiff would obtain redress, at

least in the form of statutory damages, 15 U.S.C. § 1692k(a)(2), by a favorable judgment. *See Lujan*, 504 U.S. at 560.

### D.     Summary Judgment Motions

#### 1.     Dracht's Declaration

Both sides have moved for summary judgment. Before addressing the merits, a preliminary matter needs resolution: Defendant's reliance on its president's declaration. Recall that the president, Dracht, stated in the declaration that Defendant's policy of rejecting certified mail reflects industry practice and was instituted "to better track and manage the response time" for service of process in litigation. (ECF 35 at PageID.218.) Plaintiff objects that the testimony about industry standards amounts to expert opinion, and that this late attempt to sneak such evidence in is untimely. (ECF 41 at PageID.322.) Two out-of-circuit cases are cited, but nowhere is the relevant law discussed or applied. (*Id.*) Defendant, citing one foreign case, replies that "under some circumstances lay witness opinion testimony regarding standard industry practices is appropriately admitted." (ECF 42 at PageID.334.) What circumstances? Defendant does not say.

As a result neither party meaningfully analyzes whether the testimony could be presented at trial in an admissible form. This oversight hamstrings the Court because evidence at the summary judgment stage "should be admissible but does not necessarily need to be presented in an admissible form." *Hill v. Walker*, 2015 WL 5211919, at *11 (E.D. Mich. Aug. 31, 2015).

As a general matter, it is not the Court's role to construct the parties' arguments. *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("In our adversary system, in both

civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.... [A]s a general rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.' " (citation omitted)). The Court could not decide this dispute based on the caselaw cited by the parties. Plaintiff relies on two cases for the basic proposition that expert testimony "is often" needed or "generally required" to establish an industry's standards. (ECF 41 at PageID.322 (quotation marks and citations removed).) This is a generality, not a rule the Court could directly apply here.[9] Neither case relates to the necessity of experts for explaining debt collectors' mailing policies. Defendant's lone citation is similarly unilluminating. With it, Defendant bolsters not even a generality but a mere possibility (*i.e.*, that lay opinions on industry practices are sometimes permissible); and the lay opinion in that case—a doctor's testimony on "medical practice in the mid to late 1950s in" a small Pennsylvania city—is even further removed from the facts of the present case. *Fecho v. Eli Lilly & Co.*, 914 F. Supp. 2d 130, 142 (D. Mass. 2012); *see* (ECF 42 at PageID.334).

More particularly here, the dispute over Dracht's possible testimony involves determining whether it "consists of opinions or commentary grounded in 'specialized

---

[9] Perhaps as a mark of Plaintiff's cursory discussion, he indicates that a 2004 Colorado Supreme Court case quoted a 2017 federal district court case. (*Id.* ("*See Goodson v. Am. Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 415 (Colo. 2004) (*quoting O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 926 (D. Colo. 2017), for the proposition that '[t]he aid of expert witnesses is often required in order to establish objective evidence of industry standards').").) The other case Plaintiff cites is based on New Jersey law. (*Id.* (citing *Deficcio v. Winnebago Indus., Inc.*, 2015 WL 5722724, at *2 (D.N.J. Sept. 29, 2015)).

knowledge, that is, knowledge that is 'beyond the ken of the average juror.'" *Sandford v. Russell*, 387 F. Supp. 3d 774, 778 (E.D. Mich. 2019). Is there something about the mailing policies of debt collectors that the average juror cannot understand? The parties have not provided sufficient factual or legal support to decide this question one way or the other. And even if they had, Plaintiff has not presented any record materials or relevant law to support the conclusion that Dracht "was never identified as an expert witness" and therefore is barred from repeating at trial the statements in his declaration. (ECF 41 at PageID.322.)

In any event, the Court is spared from resolving whether the declaration is proper summary-judgment evidence because, for the reasons below, material factual issues exist precluding summary judgment. That is, even with the declaration, Defendant is not entitled to summary judgment. And even without it, Plaintiff is not entitled to summary judgment on his § 1692f claim; his § 1692g(b) can be resolved without regard to Dracht's declaration.

### 2. Motions for Summary Judgment on Section 1692f

### a. Parties' Arguments

Both parties think the record leaves no question regarding Plaintiff's 15 U.S.C. § 1692f claim. Defendant suggests that, to be "unfair" or "unconscionable" under that provision, the challenged debt-collection practice must be "'shockingly unjust or unfair, or affronting the sense of justice, decency, or reasonableness.'" (ECF 35 at PageID.212 (*quoting McCrobie v. Palisades Acquisition XVI, LLC*, 359 F. Supp. 3d 239, 246 (W.D. N.Y. 2019)).) In Defendant's opinion, the non-exhaustive list of examples of such practices in § 1692f(1)-(8) represent much more egregious conduct than its own policy of declining

30

certified mail. (*Id.*) Generally, Defendant explains, claims under § 1692f exist when debt collectors have taken money or property without authorization or have communicated with consumers in a way that embarrasses them or invades their privacy. (ECF 35 at PageID.213 (*citing Feldheim v. Fin. Recovery Servs., Inc.*, 257 F. Supp. 3d 361, 368 (S.D.N.Y. 2017)).) No such things happened here, Defendant claims—all that resulted from the policy was a few extra voicemails and a letter. (*Id.*) And Defendant protests that it had "no nefarious purpose" in constructing its certified mail policy; Plaintiff has not presented evidence to the contrary nor is there any "reason to believe that debtors are submitting written disputes via certified mail with any regularity." (ECF 35 at PageID.213-214.) Rather, the policy's "logic is simple: Michigan allows service of summonses by in-person service or by certified mail. MCR 2.105, FRCP 4(e). CARM's policy is meant to avoid a situation where a summons and complaint served by certified mail becomes commingled with regular mail retrieved from the company PO Box, where it may be at risk of getting misplaced." (ECF 42 at PageID.334.)

As for relevant caselaw, Defendant states that "it appears no court has held that a policy of refusing to pick up certified mail rises to the level of unfairness or unconscionability contemplated by § 1692f, and any court to consider that specific issue has come to the opposite conclusion." (ECF 42 at PageID.332-333.) The support for this assertion is *Schroeder v. Kahrs*, 2015 WL 5837689, at *3 (D. Kan. Oct. 7, 2015), discussed below.

Plaintiff responds that the standard for measuring fairness is whether the least sophisticated consumer would consider the challenged conduct unfair. (ECF 41 at

PageID.320.) If reasonable minds could differ on that question, the case must go to the factfinder, Plaintiff contends. (*Id.*) Defendant's mail policy, according to Plaintiff, "confers no benefit to consumers and frustrates their ability to communicate with debt collectors" through the legitimate means of certified mail. (ECF 41 at PageID.321.) Defendant has cited "no authority to the contrary—let alone FDCPA case law for the idea that collectors may leave consumers in limbo by ignoring their written communications." (*Id.*) Dracht's declaration about the policy makes little sense to Plaintiff: "It is hard to imagine how tracking and managing the response time to attempted service of process in litigation would be aided by *refusing* certified mail." (ECF 41 at PageID.322-323.) The fact that the policy applies to *all* certified mail, rather than just from consumers, is not material. (ECF 41 at PageID.323.)

In his motion for summary judgment, Plaintiff argues that nothing in Defendant's original letter (in May 2017) "indicates that Defendant would refuse to honor certified mail, . . . and Defendant's statement that it picks up first-class mail from its PO Box 'daily,' . . . confirms that it would not have required any additional effort on Defendant's part to retrieve certified letters." (ECF 37 at PageID.241 (citation omitted).) Plaintiff then discusses *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407 (2017), which he admits did not establish any bright-line test but is instructive because in rejecting a § 1692f claim the Court noted that the challenged practice (filing claims in bankruptcy based on time-barred debts) might sometimes benefit a debtor. (ECF 37 at PageID.242.) To Plaintiff, this signifies that "a practice *would* be 'unfair' under § 1692f were it to result in absolutely no benefit to the consumer, yet have the obvious potential to harm." (*Id.*) Plaintiff claims that

his inference from *Midland*'s non-bright-line rule means that he is entitled to summary judgment: "no reasonable jury could find that Defendant's policy of refusing to retrieve its certified mail is *not* unfair" because the "practice serves no conceivable benefit to the consumer and clearly frustrates his ability to communicate with his debt collector" or keep a record of those communications; meanwhile, Plaintiff asserts, "[t]he debt collector, with its superior organizational resources, is likely keeping its own record on him." (ECF 37 at PageID.243.) Ergo, Plaintiff concludes that this misbalance in record keeping "constitutes a form of injustice or partiality, which is not balanced by any reasonable need of the debt collector." (*Id.*)

In his reply brief, Plaintiff introduces Federal Trade Commission (FTC) commentary defining the term "unfair" in the FDCPA as an action that causes substantial injury that the consumer could not reasonably avoid and that was not outweighed by its benefits to consumers. (ECF 43 at PageID.344 (*citing* FTC Commentary, 53 Fed. Reg. 50,097, 50,107 (Dec. 13, 1988)).) Apparently, this shows the need to balance the costs and benefits of the policy, which is the same lesson Plaintiff derives from *Midland*. But, relying on a Seventh Circuit case, Plaintiff denies that the injury needs to be "substantial"; rather, he says "[w]hat matters is that the injury or harm was material *within the scope* of the FDCPA." (ECF 42 at PageID.345-346.) Mashing this all together, Plaintiff offers the following test for determining whether conduct is "unfair": "(1) harms or risks harming the consumer; (2) in a material way; (3) and lacks any substantial justification." (ECF 43 at PageID.345.) The injury here meets that standard because it materially harmed Plaintiff

within the scope of the FDCPA by implicating § 1692g(b)'s suspension of collection efforts," and was not justified. (ECF 43 at PageID.345-346.)

### b.    Analysis

Plaintiff invokes § 1692f "catchall provision that forbids a debt collector from using 'unfair or unconscionable means to collect or attempt to collect any debt.'"[10] *Clark v. Lender Processing Servs.*, 562 F. App'x 460, 467 (6th Cir. 2014) (quoting 15 U.S.C. § 1692f). The statute leaves the phrase "unfair or unconscionable" undefined. *Currier*, 762 F.3d at 534. As the Seventh Circuit recognized, these words are "as vague as they come." *Beler v. Glatt, Hazenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 474 (7th Cir. 2007). While the Supreme Court has never given a definitive interpretation to this language, it has noted caselaw suggesting the terms "borrow from equitable and common-law traditions." *Midland Funding*, 137 S. Ct. at 1418 (citing *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1200-1201 (11th Cir. 2010); *Beler*, 480 F.3d at 473-474).

Defendant correctly observes that some courts have defined the phrase as referring to "practices that are 'shockingly unjust or unfair, or affronting the sense of justice, decency, or reasonableness.'" *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 135 (2d Cir. 2017) (quoting case law that uses the language of *Black's Law Dictionary*

---

[10] Defendant has offered no argument that it falls outside the statutory definition of "debt collector," 15 U.S.C. § 1692(6), or that Plaintiff is not a "consumer" as defined by the FDCPA, 15 U.S.C. § 1692(3). Defendant's answer admitted it "sometimes acts as a 'debt collector' as that term is defined in the FDCPA." (ECF 7 at PageID.31, 32.) Plaintiff's motion for summary judgment offered evidence that Defendant fits the statute's definition. (ECF 37 at PageID.237-238.) Defendant did not respond to these contentions. (ECF 40.) This failure forfeited any argument regarding whether Defendant is a "debt collector." *Cf. Kilmer v. Leavitt*, 609 F. Supp. 2d 750, 756 n.6 (S.D. Ohio 2009) (noting that arguments must be raised in initial briefing, as opposed to a reply brief, in order to avoid forfeiture). The same goes for Plaintiff's status as a "consumer," which is defined as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692(3). Even if this issue were before the Court, Plaintiff fits the definition.

(10th ed. 2014)); *see also LeBlanc*, 601 F.3d at 1200 ("The plain meaning of 'unfair' is 'marked by injustice, partiality, or deception.' . . . The term 'unconscionable' means 'having no conscience'; 'unscrupulous'; 'showing no regard for conscience'; 'affronting the sense of justice, decency, or reasonableness.'" (citations omitted)). But this seemingly high bar is set by the perspective of the least sophisticated consumer. *Arias*, 875 F.3d at 135. So whether a practice falls within § 1692f's prohibition depends on whether the least sophisticated consumer would view it as "unfair or unconscionable." *Currier*, 762 F.3d at 535. This "requires a fact-bound determination" of how the consumer would perceive the practice. *McMillan v. Collection Professionals Inc.*, 455 F.3d 754, 759 (7th Cir. 2006).

Plaintiff's tripartite test for unfairness is an admirable effort to give the statutory language workable meaning, but I am unconvinced the Court should adopt it here. Most significantly, this case does not turn on any fine distinctions between possible definitions of the relevant statutory language. Under either party's approach, I would find issues of material fact. The bedrock inquiry is how the least sophisticated consumer would appraise the conduct. This might involve considerations of costs and benefits, like those suggested by Plaintiff's test, and this practical balancing might also reflect Defendant's emphasis on whether the practice affronts the sense of reasonableness. The least sophisticated consumer, for example, might consider it unfair or unconscionable if the debt collector's refusal to take a simple and costless action risked gravely injuring the consumer. But it cannot be forgotten that the ultimate criterion is the statutory text—specifically, the ordinary meaning

of that text at the time of its enactment, *see Wisconsin Central Ltd. v. United States*, 138 S.

Ct. 2067, 2070 (2018)—not the court's notion of economically optimal practices.[11]

Defendant's reliance on §1692f's listed examples to give meaning to the section's

catchall category is misplaced. The interpretive canon behind Defendant's argument is

*ejusdem generis*, which provides that "[w]here general words follow an enumeration of

two or more things, they apply only to persons or things of the same general kind or class

specifically mentioned." Hon. Antonin Scalia & Bryan Garner, *Reading Law: The*

*Interpretation of Legal Texts*, § 32 (2012). But the canon traditionally does not apply to

groupings like that in § 1692f where the general category precedes the specific examples.

*Id.*; *but cf. Delfonce v. Eltman Law, P.C.*, 2017 WL 639249, at \*5 (E.D.N.Y. Feb. 16, 2017)

("The list of actions described in subsections (1) through (8) of Section 1692f provides

some context for the meaning of 'unfair or unconscionable.'").

---

[11] I am not fully persuaded by Plaintiff's reliance on *Midland Funding* and the FTC commentary, although he raises an interesting reading of the former. In that case, the opinion's observation that the challenged practice—allowing creditors to file time-barred claims in bankruptcy—might sometimes benefit a consumer was part of the Court's response to the plaintiff's argument that there was no legitimate reason to allow the practice. 137 S. Ct. at 1414. It is not clear, however, that the observation was directly linked to that argument, at least in the manner Plaintiff posits. The "benefit" to the consumer was that the stale claim could be discharged in bankruptcy; but that would not be a reason why creditors would file such claims. Thus, it is not clear that the Court was looking at the practice's benefits for the debt collector (*i.e.*, the reasons it engaged in the practice) versus the benefits or harms to the debtor. *McMillan*, 455 F.3d at 764-765. Not even Plaintiff wants this requirement. And the other two FTC prongs do not appear to be glosses of any sort on the statutory language, but rather the agency's own concoctions. They might, however, constitute characteristics of unfairness in particular cases. Thus it might be thought that a specific practice is fair because, although it blocks the consumer from one path, it leaves open many others that reach the same end.

Assuming it applies here, and that the list of specific examples limits the scope of the catchall, Defendant's argument still fails to convince. Courts utilizing the canon must discern some characteristic common to all the specifics that can then be applied to narrow the scope of the general catchall. *Id.*; *see also* M.B.W. Sinclair, *Law and Language: The Role of Pragmatics in Statutory Interpretation*, 46 U Pitt L Rev 373, 411-412 (1985). Here, Defendant suggests that the relevant commonality among the specific practices is that each "has the nature consequence of subjecting debtors to significant psychological harm." (ECF 35 at PageID.212.) But refusing certified mail has no such deleterious effects, according to Defendant—all that happened here was a few voicemail and an extra letter, there was no effort to take money without authority or embarrass Plaintiff. (ECF 35 at PageID.213.)

The first problem with this interpretation is that it compares apples to oranges: it juxtaposes the abstract consequences attached to the specific list with a very narrow characterization of what occurred here (voicemails and a letter). If the "natural consequence" of Defendant's certified-mail practice was cast in slightly more abstract terms, it too could be made to fit the list. For example, it could be argued that the natural consequence of or risk posed by Defendant's policy is to impede debtors' ability to exercise their dispute rights, thus subjecting them to collection activities despite their timely written disputes.

Relatedly, Defendant's conduct could be seen as an "attempt to take money or property without authority," contrary to Defendant's assertion. (ECF 35 at PageID.213.) Plaintiff has presented evidence showing that Defendant attempted to collect a debt during

a period in which § 1692g(b)'s prohibited collection—that is, Defendant attempted to take money without authority to do so.

Finally, even if Defendant has selected an appropriate common characteristic of § 1692f's list that applies to the catchall, the risk posed by collection activities during § 1692g(b)'s collection freeze is as significant as those in the list. The threat is that ignoring the collection freeze will impede the statute's important functions in enabling ready resolution of debt disputes and protecting misidentified debtors or debtors who have already paid. *See generally Vangorden*, 897 F.3d at 440-441. Depriving a consumer of these protections seems as significant, in terms of the potential harms to the consumer, as communicating with the consumer by postcard, for example. *See* 15 U.S.C. § 1692f(7).

Turning to the caselaw, few decisions address how the statute applies to circumstances like the present. Defendant suggests that this silence supports its position, reaching this conclusion based on *Schroder v. Kahrs*, 2015 WL 5837689. There, the plaintiff owed a debt to a school, which referred the matter to the defendant debt collector. *Id.* at *1. The court, after noting simply that the matter was referred for collection—but saying nothing about whether and how the defendant reached out to the plaintiff—gave the following as its full description of the relevant facts: "Plaintiff attempted to contact Kahrs [the defendant] about the debt by telephone and by email, to no avail. Kahrs sued plaintiff to collect the debt and served plaintiff at an incorrect address. Plaintiff then attempted to contact Kahrs by certified mail, but Kahrs refused the delivery." *Id.* The plaintiff's complaint was two pages and alleged that the defendant "violated § 1692f by . . . refusing delivery of mail." *Id.* at *3. The court's entire analysis was as follows:

> Finally, plaintiff alleges that he attempted to mail or call Kahrs to settle the debt, but that Kahrs refused the communications. He argues that Kahrs's conduct was intended to ensure that the debt was collected only through litigation, in efforts to increase Kahrs's profits. Again, the court is unable to identify authority indicating that such conduct would violate § 1692f. Plaintiff does not allege that defendant seeks to recover from him an amount greater than the actual debt. Nor does he allege any other conduct specified in § 1692f.

*Id.*

From this analysis, Defendant says that it "appears" no court has ever supported Plaintiff's position, and that "any court" taking up the issue has rejected it. (ECF 42 at PageID.332-333.) This sweeping conclusion cannot be reached from the few lines in *Schroeder*. The claim in that case, at least as described by the court, was not that the plaintiff sought to dispute the debt in writing, thus triggering § 1692g(b)'s moratorium. Here, by contrast, Plaintiff relies on a statutory provision that gives him the right to submit disputes in writing, and he claims that Defendant's policy stymied him from exercising that right. Even if *Schroeder* could be read to lend some support for Defendant's position, the analysis it offers is too brief to be persuasive.

A more apt case is *In re Scrimpsher*. 17 B.R. 999 (N.D.N.Y 1982). The debt collector there sent collection letters without providing any return address; only on the sending envelop did the collector's address appear. *Id.* at 1014. The court found that the debtor consequently lacked "direct means to contact" the collector. *Id.* "The absence of a return address on a debt collector's notices effectively nullifies the consumer's rights set out in . . . [§] 1692g(b), which arise[s] from a consumer's written notification to the debt

collector." *Id.* As such, the court found "that an omission in the notices' contents" of a return address was an unfair practice under § 1692f. *Id.*

It could be argued that *Scrimpsher* is easy to brush aside because the court there found that the plaintiff lacked the means to contact the collector. What is more, part of that finding was based on the debt collector's location "in a distant city," making it impossible for the plaintiff to "independently ascertain by local inquiry the debt collector's address." *Id.* Here, Defendant might contend, Plaintiff had no problem finding out where to send his letter, he just did it through the wrong medium, *i.e.*, certified mail.

Yet, it many ways, Defendant's policy—at least through the eyes of the least sophisticated consumer—stifled Plaintiff's rights under § 1692g(b) just as the letter in *Scrimpsher* did. Defendant's letter nowhere indicated that certified mail would be rejected. (ECF 1 at PageID.11.) Instead, it simply stated that Plaintiff could "notify this office in writing" if he disputed the debt and provided the address that Plaintiff ultimately used. (*Id.*) Of course Plaintiff could have sent non-certified mail; but, by the same logic, the plaintiff in *Scrimpsher* could have responded to the address on the envelope. Like the unstated address in *Scrimpsher*, the unstated mailing policy here raised significant obstacles to the Plaintiff's ability to timely dispute his debt and invoke § 1692g(b)'s protections.

It would have been entirely reasonable for any consumer, let alone the least sophisticated one, to believe that sending the letter by certified mail in response to Defendant's communication was permissible. The P.O. box on Defendant's letter was where debtors were told to send checks, and Plaintiff could have reasonably concluded that many debtors would send them by certified mail so that they could verify Defendant's

receipt of the payments. Relatedly, Plaintiff, or the least sophisticated consumer, would also have been well justified in thinking that Defendant would collect certified mail because nothing about a letter's being "certified" makes it more harmful to a recipient. Certified mail simply "provides the sender with a mailing receipt and electronic verification that an article was delivered or that a deliver attempt was made." United States Postal Service (USPS), *What is Certified Mail?*, https://faq.usps.com/s/article/What-is-Certified-Mail (accessed September 25, 2019).

Defendant's fear of certified mail based on Mich. Ct. Rule 2.105(A)(2) fails to persuade.[12] It avoids all certified mail because some of that mail might be service of process instituting a lawsuit, and Defendant worries that such service would get lost with the regular mail; thus, it prefers to receive service of process in person. (ECF 42 at PageID.334.) Even assuming that this is true, Defendant's explanation fails to convince me that its policy is so reasonable that no jury could find it unfair. Such a conclusion would require the least sophisticated consumer to recognize that Defendant takes such a dim view of its ability to keep its mail organized that it avoids all certified mail so that service of process cannot be completed by mail. Forcing the least sophisticated consumer to have such foresight, at the risk of forfeiting rights under § 1692g(b), could be deemed an unfair practice under § 1692f.

---

[12] Really, Defendant's explanation invoking the Court Rule is a gloss on Dracht's declaration but is not at all apparent in the declaration, and thus arguably cannot be relevant evidence at this stage. *See Hill*, 2015 WL 5211919, at *20 (noting that factual assertions in briefs are not proper evidence). I will consider it nonetheless because it does not help Defendant even if it comes in.

A few cases have dealt with a debt collector's mailing procedures in the context of § 1692k bona fide error defenses. Under that defense, a debt collector will escape liability for a violation of the statute if it can demonstrate that the error was not intentional and the collector maintained "procedures reasonably adopted to avoid any such error." 15 U.S.C. § 1692k(c); *see generally Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 614 (6th Cir. 2009). Courts have rejected this defense, or found that it raised only a triable issue, when a collector maintained procedures that stymied consumers' efforts to contact them in writing to invoke FDCPA protections.

For instance, in *Isham v. Gursetl, Staloch & Chargo, P.A.*, the plaintiff alleged violations of § 1692g(b) when the collector continued to seek the debt after it had "received timely notice of the dispute" but failed to send the plaintiff verification of the debt as required by the statute. 738 F. Supp. 2d 986, 997 (D. Ariz. 2010). The collector invoked the bona fide error defense, contending that it simply lost the plaintiff's letter despite having extensive FDCPA compliance procedures in place. *Id.* at 998. None of those procedures, however, were designed to avoid the "mishandling and loss of consumer mail." *Id.* at 999. Therefore, the defense could not apply.

A similar case is *Carrigan v. Central Adjustment Bureau, Inc.*, where the plaintiff claimed that he sent a letter to a debt collector requesting under § 1692c(c) that it cease communicating with him. 494 F. Supp. 824, 825-826 (N.D. Ga. 1980). Under that statutory section, once the request is made the collector must stop communications except for a few circumstances inapplicable in *Carrigan*. *See* 15 U.S.C. § 1692c(c). The collector in *Carrigan* kept contacting the plaintiff because the collector's employee did not see the

letter. 494 F. Supp. at 825-826. Upon being sued, the collector raised the bona fide error defense, arguing that the employee did not intend to violate § 1692c(c) because he had never seen the plaintiff's letter. *Id.* at 826-827. But the collector lacked any procedure for handling mail; instead, "it was 'just understood' that employees would" collect the mail from the Post Office and pass it out to the appropriate employee. *Id.* at 827. The court found that this system was not reasonably maintained to avoid the error, and thus it rejected the collector's attempt to use the defense. *Id.*

Many courts have reached like results. One found a jury question regarding the defense when raised against a § 1692g(b) claim where the plaintiff's certified mail to the collector was lost and the collector presented no evidence that it trained mailroom staff to recognize § 1692g dispute letters. *VanHuss v. Rausch, Sturm, Israel, Enerson & Hornik*, 2017 WL 1379402, at *7 (W.D. Wis. April 14, 2017). Citing multiple cases, the court noted that "[c]ourts have rejected a finding of bona fide error under similar circumstances." *Id. See also Serrano v. Van Ru Credit Corp.*, 126 F. Supp. 3d 1005, 1009, 1010 (N.D. Ill. 2015) (finding a jury issue regarding whether the collector maintained proper procedures to identify debtor letters that would require a cessation in collection activities); *Ramirez v. Apex Fin. Mgmt., LLC*, 567 F. Supp. 2d 1035, 1043 (N.D. Ill. 2008) (rejecting the defense against a § 1692c(c) claim where the collector's "loose" mailing procedures caused a seven-day delay between receiving the letter and putting the cessation into effect); *McDaniel v. South & Assoc., P.C.*, 325 F. Supp. 2d 1210, 1219 (D. Kan. 2004) (finding a jury question about the defense when the collector initially failed to cease collection

43

activities after receiving the plaintiff's letter because the collector took an extended period to process the dispute letter).

It is true that these cases do not directly apply here. There is no indication in the statute or the caselaw that failure to maintain proper procedures for purposes of the bona fide error defense is tantamount to an "unfair" or "unconscionable" practice under § 1692f. Nonetheless, the cases are instructive because they demonstrate that courts have not let collectors off the hook simply because they had a procedure for collecting or processing mail. And the courts have rejected, or at least let the jury reject, the adequacy of collectors' mailing processes that are more generous—*i.e.*, more likely to lead the collector to receive, process, and comply with letters from consumers—than the one here, which flatly rejects certified mail without (it seems) any notice of the policy to the consumer. Thus, the cases do not show that the policy here is unfair or unconscionable, but they provide rationales that the factfinder might also utilize (along with other factors) to find a violation of § 1692f.

These considerations lead me to conclude that a jury question exists regarding Plaintiff's § 1692f claim. A factfinder could conclude that rejecting certified mail under these circumstances is unfair because it creates a significant risk that the consumer's statutory rights will be violated based on a questionable justification. In addition, the factfinder could take notice of the Defendant's "superior economic position" when considering unconscionability. *Williams v. Javitch, Block & Rathbone, LLP*, 480 F. Supp 2d 1016, 1023 (S.D. Ohio 2007) (*citing Adams v. Law offices of Stuckert & Yates*, 926 F. Supp. 521, 528 (E.D. Pa. 1996)). Or the factfinder might believe that Plaintiff had alternative and equivalent means of submitting his written dispute, and thus Defendant's

policy is not unfair. Perhaps, as a result, the factfinder might conclude that the link between the policy and the subsequent collection efforts is too attenuated. Because a reasonable factfinder could reach either conclusion, I suggest that a genuine issue of material fact exists regarding the § 1692f claim that precludes granting summary judge in favor of either party.

### 3.    Motion for Summary Judgment on Section 1692g(b)

#### a.    Parties' Arguments

Finally, Plaintiff seeks summary judgment as to Defendant's liability for violating § 1692g(b). (ECF 37 at PageID.238-240.) First, he contends that there is no question that he timely mailed his dispute letter to Defendant and that the letter "constituted a timely written notification for purposes of § 1692g(b). (ECF 37 at PageID.239.) Defendant cannot dispute timeliness because, as it admitted, it lacked knowledge regarding whether Plaintiff mailed the letter to its P.O. Box. (*Id.*) And Plaintiff's letter was necessarily a notification of the debt within 30 days of his receiving the initial communication from Defendant: the creditor did not refer the matter to Defendant until May 8, 2017, and the postal tracking slip showed that Plaintiff's letter arrived in the P.O. box on May 25, 2017, within 30 days. (*Id.*) The Court has already established that Defendant received the letter. (*Id.* (*citing* ECF 21 at PageID.134).) The last piece of Plaintiff's argument is that Defendant continued collection efforts after receiving the dispute letter but before validating the debt. (ECF 37 at PageID.240.) The five calls and letter during this period are not in question, Plaintiff concludes. (*Id.*)

Defendant responds by listing a series of facts that are not disputed: its initial letter contained the validation notice complying with § 1692g(a); Plaintiff's certified letter was returned to him unopened in June; Defendant was not aware that Plaintiff disputed the debt until it received Plaintiff's August 22, 2017 letter; and upon receiving that letter, Defendant stopped collection activities per § 1692g(b). (ECF 40 at PageID.302-303.) "As a result," Defendant concludes, "Plaintiff was not denied the opportunity to dispute the debt provided by § 1692g." (ECF 40 at PageID.303.) From there, Defendant argues that Plaintiff suffered no actual damages, Defendant's contacts were not harassing or threatening, Plaintiff endured only the minimal trouble of sending a second letter to Defendant, and the failure to receive Plaintiff's dispute letter "was the unintended result of a policy maintained in good faith to manage and track deadlines for lawsuits." (ECF 40 at PageID.303-304.)

### b.   Analysis

As noted above, § 1692g gives consumers 30 days from the debt collectors' initial communication to provide the collectors with a written dispute of the debt. If they do, then the collectors "shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt" or similar materials. 15 U.S.C. § 1692g(b). Until the consumer gives the written notice, the debt collectors can continue "[c]ollection activities and communications that do not otherwise violate" the FDCPA. *Id.* The debt collector who receives a written dispute does not face any deadline for validating the debt. *Purnell v. Arrow Fin. Servs., LLC*, 303 F. App'x 297, 303 (6th Cir. 2008). Indeed, there is no need to validate the debt at all—nothing in the statute requires it—and as long as the collector does not attempt to collect the debt, no violation of § 1692g(b) occurs. *Id.*

46

Thus, the debt collector who receives a timely written dispute "has a choice: it either may choose not to verify the debt and abandon its collection efforts, or it may decide to verify the debt and resume collection activities once the requested validation has been provided." *Id.* at 304; *see also Smith v. Transworld Sys., Inc.*, 953 F.2d 1025, 1032 (6th Cir. 1992) ("Because Transworld ceased collection activities after the receipt of Smith's cease and desist letter, . . . Transworld did not violate the provisions of 15 U.S.C. § 1692g(b)."). If the collector does neither and instead continues collection before eventually validating the debt, a triable issue might exist as to whether the collector violated § 1692g(b). *See, e.g.*, *Essique v. Walnut Woods Condominium Assoc.*, 2016 WL 7337246, at *2-3 (E.D. Mich. Dec. 19, 2016); *cf. Isham*, 738 F. Supp. 2d at 997 (same where the obligation to cease communications arose from § 1692c(c)).

Recently, the Sixth Circuit interpreted the pertinent language in § 1692g(b), noting that the statute does not define the term "cease." *Scott v. Trott Law, P.C.*, 760 F. App'x 387, 392 (6th Cir. 2019). The court relied on the dictionary definition of "cease" as meaning "'to stop,' 'to come to an end,' 'to suspend or forfeit.'" *Id.* (*quoting Black's Law Dictionary* (5th ed. 1979). "The direct object of the verb 'cease' is 'collection of the debt.' It follows that the statute imposes on the 'debt collector' an obligation *to stop* the 'collection of the debt.'" *Id.* at 392-393. But, as noted, "[t]his obligation exists only until the debt collector 'obtains verification' of the debt and sends it to the debtor, after which the debt collector is free to resume collection of the debt." *Id.* at 393.

The decision in *Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, demonstrates how to analyze § 1692g(b) at the summary-judgment stage. 758 F.3d 777

(2014). In that case, the consumer and debt collector exchanged a series of letters in which the consumer timely and consistently disputed at least a portion of the debt. *Id.* at 780-781, 785-786. Even after receiving Plaintiff's first letter disputing the debt, the collector sent another note demanding payment. *Id.* at 780. At some point, the collector did not respond to the consumer's dispute "with any explanation such as a date or description of the nature of the [disputed] charge. Instead, it filed a lien against [the consumer's] condominium." *Id.* at 785. The court determined that the collector failed to verify the challenged portion of the debt "yet continued its efforts to collect this portion as well as the entirety by sending a letter demanding payment and placing a lien on [the consumer's] condominium. In doing so, the firm violated 15 U.S.C. § 1692g(b)." *Id.* at 786. The court consequently granted summary judgment for the consumer. *Id.*

*Haddad* thus stands for the proposition that, when no material issue of fact exists as to the consumer's timely demand and the collector's failure to verify the debt before continuing collection, the consumer is entitled to summary judgment. Moreover, a demand letter constitutes collection efforts that can violate § 1692g(b). Of course, it must be noted that the thrust of *Haddad*'s analysis was determining whether the collector had adequately verified the debt. Nonetheless, the result was that the consumer obtained relief by demonstrating at the summary-judgment stage a timely dispute, lack of verification, and continued collection efforts.

These same determinations formed the basis for granting summary judgment to the plaintiff in *Kasalo v. Trident Asset Management, LLC*, 53 F. Supp. 3d 1072, 1084 (N.D. Ill. 2014). Summary judgment was warranted, the court found, due to the lack of genuine

factual disputes on "whether [the consumer] sent a written dispute of his debt to [the collector],' "whether he sent this writing within the required thirty-day time frame," and "whether [the collector] continued its debt efforts against [the consumer] despite this notice." *Id.*; *see also Isham*, 738 F. Supp. 2d at 997 (finding violation of § 1692g(b) based on continued collection efforts).

Here, I suggest that Plaintiff has made the same showing, and that no genuine issues of material fact bar him from establishing Defendant's liability for violating § 1692g(b). To begin, the Court has already decided that "Plaintiff timely mailed his notification of dispute and has proof of delivery from the post office—in the form of electronic verification—that the letter was delivered to Defendant's P.O. box. . . . Plaintiff has established receipt of his written dispute by providing proof of delivery, and has thus satisfied the notification requirements in § 1692g(b)." (ECF 21 at PageID.134.)

True, that decision came at the pleading stage on a Fed. R. Civ. P. 12(c) motion for judgment on the pleadings. (ECF 19 at PageID.112-115.) But even at that early period, written instruments attached to a pleading are "part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Thus, courts facing motions on the pleadings can consider documents mentioned in and attached to a complaint and central to the claims. *See Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999). Here, Plaintiff's complaint referred to and had attached a copy of his letter, with delivery and return stamps, thus making the evidence part of the pleadings. (ECF 1 at PageID.14.) Defendant has presented no additional evidence on this matter and its discovery responses stated that it lacked knowledge about whether Plaintiff sent the letter. (ECF 38 at PageID.253.) Thus, Plaintiff

49

does not appear to question or challenge with new evidence the Court's prior determination that Plaintiff fulfilled the § 1692g(b) notification requirements. (ECF 34 at PageID.134.)

As such, there is no genuine issue of material fact about Plaintiff's satisfaction of the statutory prerequisite to § 1692g(b)'s collection freeze. This means that there can be no dispute that Defendant was obligated to verify the debt before proceeding with collection. And again, as discussed more below, Defendant offers neither argument nor evidence suggesting otherwise. The question thus becomes whether Defendant engaged in collection efforts without first verifying the debt.

As with the preceding issues, there is no question of material fact concerning Defendant's post-dispute-letter collection efforts. Defendant has admitted making five calls and sending one letter before marking Plaintiff's account as "disputed" on August 24, 2017, "in order to insure that no further notices or calls would take place." (ECF. 38 at PageID.261; ECF 35 at PageID.218-219.) Defendant fails to argue that these activities fall short of constituting "collection of the debt" under § 1692g(b). And indeed, the letter sent during this period clearly demanded payment, just like the letter in *Haddad* that violated § 1692g(b). *See also Leeb v. Nationwide Credit Corp.*, 806 F.3d 895, 898 (7th Cir. 2015) (finding that a letter stating it was attempting to collect a debt was collection activity violating § 1692g(b)). Telephone calls seeking to collect the debt also constitute collection activity violating § 1692g(b). *See Isham*, 738 F. Supp. 2d at 997

In sum, then, there is no genuine issue of material fact regarding Plaintiff's fulfillment of the statutory notice requirements and Defendant's continued collection

efforts prior to verifying the debt. Consequently, Plaintiff is entitled to summary judgment on Defendant's liability for violating § 1692g(b).

I am unconvinced by Defendant's arguments to the contrary. First, it cites a series of undisputed facts that have no connection to the elements of a § 1692g(b) claim. (ECF 40 at PageID.302-303.) Consider, for example, Defendant's reliance on the following: its initial letter complied with § 1692g(a), Plaintiff's certified mail was returned unopened, and Defendant ceased collection attempts on August 22. (*Id.*) None these facts negate or raise a triable issue regarding whether Plaintiff timely disputed the debt in writing—the fact that the letter was returned unopened is irrelevant, as the Court has already decided. (ECF 21 at PageID.134.) As noted Defendant does not appear to be challenging that previous decision. Nor does Defendant's compliance with § 1692g(a) somehow demonstrate that it also complied with the independent requirements in § 1692g(b) that are at issue here. Defendant's belated end to collection efforts in August similarly has nothing to do with whether it had earlier engaged in collection attempts. Defendant's ultimate conclusion that Plaintiff was not denied the opportunity to dispute its debt also is misguided. (ECF 40 at PageID.303.) Whether or not Defendant eventually recognized the dispute is irrelevant to whether it should have recognized the dispute earlier and stopped its collection efforts then.

Defendant's next arguments essentially repackage its contentions about standing and thus run far afield of the relevant showings to demonstrate an issue of fact on a § 1692g(b) claim. Its argument that Plaintiff did not suffer any damages and was put to only "the minimal trouble of sending a second letter" (ECF 40 at PageID.304) is irrelevant: the

51

FDCPA does not require proof of actual damages. *Wise v. Zwicker & Assoc., P.C.*, 780 F.3d 710, 713 (6th Cir. 2015). Similarly, whether Plaintiff knew that Defendant had not received his letter and should have contacted Defendant by other means in a timelier fashion does not create an issue of fact on a material matter. It does not, for example, demonstrate that Plaintiff failed to provide a proper dispute letter (again, Defendant does not take issue with the Court's earlier finding on this question).

Plaintiff's activities or lack thereof similarly do not raise a dispute regarding whether Defendant engaged in collection efforts before verifying the debt. Defendant's contentions about its efforts—*i.e.*, the phone calls and second letter—do not dispute that they were collection attempts. Instead, it notes that none of those attempts used threatening or harassing language. But there is no requirement that Plaintiff prove harassments or threats under § 1692g(b): all that he must demonstrate is that collection activity occurred. So the lack of threats and harassment does not raise a valid factual dispute.

Defendant's ending argument about its good faith is similarly unavailing. (ECF 40 at PageID.304-305.) It states that its certified-mail policy was instituted in good faith and that the failure to receive Plaintiff's letter was an "unintended result" of that policy; further, Defendant demonstrated its good intentions by treating Plaintiff's August 22 letter as a timely dispute even though it could "have taken the position that Plaintiff's validation period had expired and continued its collection efforts." (*Id.*) As an initial matter, although the substance of some of Defendant's contentions overlap with parts of the bona fide defense in § 1692k(c), it never references that provision or suggests it is invoking the defense. Even if the statements could be construed as an attempt to raise the defense, the

52

arguments would not be adequately developed because Defendant fails to cite any facts or law regarding the reasonableness of its procedures for avoiding the error at issue. Without that defense, the statute otherwise imposes strict liability and thus Defendant's intentions cannot save it. *See Isham*, 738 F.3d at 997 ("[T]he FDCPA is a strict liability statute, so [the debt collector's] recommencement of collection activities without verification violated 15 U.S.C. § 1692g(b).") Further, Defendant's contentions about its good faith are irrelevant to whether Plaintiff's first dispute letter properly triggered § 1692g(b)'s protections against collections and whether Defendant violated those protections by attempting to collect the debt without first verifying it.

Consequently, I suggest that Plaintiff is entitled to summary judgment regarding Defendant's liability for violating § 1692g(b).

### E.   Conclusion

For the reasons above, the Court recommends that Defendant's motion for summary judgment (ECF 35) be **DENIED**, and that Plaintiff's motion for summary judgment (ECF 37) be **GRANTED IN PART** and **DENIED IN PART**. Plaintiff has established entitlement to summary judgment regarding liability on his claim under 15 U.S.C. § 1692g(b). Neither side has demonstrated that summary judgment is warranted as to Plaintiff's claim under 15 U.S.C. § 1692f.

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may

53

respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 3, 2019                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge

## **<u>CERTIFICATION</u>**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 3, 2019                              By s/Kristen Castaneda
                                                    Case Manager